NOT DESIGNATED FOR PUBLICATION

No. 122,135

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

BEN SMITH and KERRI SMITH,
*Appellants*,

v.

IRMA ANGUIANO,
d/b/a COPA CABANA CLUB,
*Appellee*.

MEMORANDUM OPINION

Appeal from Seward District Court, CLINT B. PETERSON, judge. Opinion filed May 28, 2021. Affirmed.

*David W. West*, of Law Office of David W. West, LLC, of Liberal, for appellants.

*Derek W. Miller*, of Miller & French, LLC, of Liberal, for appellee.

Before GARDNER, P.J., GREEN and BUSER, JJ.

PER CURIAM:  In this breach of contract suit, landlords Ben and Kerri Smith sued tenant Irma Anguiano for property damage. A magistrate judge found that the tenant had breached the lease so he awarded the landlords their requested damages of $29,418.61. The tenant appealed to the district court judge, who reviewed the record and significantly lowered the amount of damages. The landlords now appeal to this court. Finding no error, we affirm.

1

*Factual Background*

Ben and Kerri Smith own commercial property that Ben has leased to interested business individuals for roughly 27 years. Irma Anguiano and Ben first entered into a lease agreement in 2009 for a two-year term. Included with the lease was a list of Ben's personal property items that Anguiano had permission to use to run her business. The Smiths and Anguiano entered a new lease every two years with no change in the lease's language. The parties did not update the inventory list and did not attach a copy of that list to their later agreements.

At the time of the initial agreement with Anguiano in 2009, the Smiths had previously rented the property to three other individuals who also used the listed personal property in their businesses. Some of the personal property and furniture on the inventory list was over 25 years old in 2009. Although the parties disagree on who terminated the rental lease, the record shows that the lease ended in November 2015.

In January 2018, the Smiths sued Anguiano for costs to repair and replace personal property and repair the real property. Magistrate Judge Thomas Kemp of the Seward County District Court, not licensed to practice law in Kansas, presided over the trial. The record shows considerable contradictory trial testimony by the parties. But it generally shows that the Smiths and Anguiano had an amicable professional relationship and had discussed the possibility of Anguiano buying the building from the Smiths. That never happened.

Anguiano testified that because she believed that she would one day purchase the property, she had removed and discarded some of its furniture that was old and unusable. But she had always asked the Smiths for prior approval. She presented evidence that much of the furniture was in poor condition when she started leasing the building, so she bought different furniture to replace it. Anguiano also testified that there were two

working air conditioners when she began leasing the building, but because the Smiths refused to replace one that did not work, she bought a new one to replace it.

The Smiths presented evidence of the 2013 lease and the 2009 inventory list. They alleged that Anguiano had impermissibly discarded furniture and other personal property from the building and gave the magistrate judge copies of pages from a catalogue showing the cost of new comparable items. Ben explained that he had bought the building 27 years earlier and had bought some of the property on the inventory list at that time. No evidence shows when Ben bought each item. He testified the building had three air conditioning units when Anguiano leased the building. But after one of the three air conditioning units failed, he told Anguiano he would not replace it, so she replaced it herself.

The magistrate judge held that Anguiano breached the lease agreement, and he awarded damages to the Smiths in the amount of $29,418.61. The magistrate judge calculated the damages based on the replacement cost of the personal property Anguiano had improperly taken from the building. Anguiano appealed the magistrate judge's decision to the district court.

The district court reviewed the trial transcript and the admitted evidence and then found:

   (1) Anguiano breached the lease;
   (2) Section Six did not establish a measure of damages;
   (3) the air conditioning unit Anguiano took belonged to her;
   (4) the Smiths failed to prove damages for the missing or damaged property; but
   (5) the Smiths were entitled to keep Anguiano's $2,000 security deposit and a
         $2,500 insurance check for an unrelated flooding incident.

3

The Smiths timely appeal.

*Procedural Background*

Under K.S.A. 2020 Supp. 20-302b(c)(2), any appeal from a district magistrate judge who is not regularly admitted to practice law in Kansas will be tried and determined on the record by the district judge. In civil cases in which there was a record of the proceedings, the appeal is tried and determined on the record by a district judge de novo. K.S.A 2020 Supp. 20-302b(c)(2). Unlike a traditional appeal, the district court tries the case solely on the record made before the magistrate but, in doing so, may make findings of fact and conclusions of law independent of the magistrate's findings. *Lamb v. Benton*, No. 113,755, 2016 WL 562920, at *2 (Kan. App. 2016) (unpublished opinion). The district court did so here.

*Standard of Review and Basic Legal Principles*

The interpretation of a written instrument is a matter of law, so an appellate court exercises unlimited review. *Trear v. Chamberlain*, 308 Kan. 932, 936, 425 P.3d 297 (2018). The district court's interpretation of the lease does not bind this court, so we may independently construe the lease's meaning and legal effect. *Wichita State Univ. Intercollegiate Athletic Ass'n v. Marrs*, 29 Kan. App. 2d 282, 283, 28 P.3d 401 (2001).

When interpreting a written lease, we must determine the parties' intent. *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015). If the terms are unambiguous, we determine the parties' intent without applying rules of construction. 302 Kan. at 104. This means that when interpreting contracts, courts must construe unambiguous phrases in accordance with their plain, general, and common meanings. *Hall v. JFW, Inc.*, 20 Kan. App. 2d 845, Syl. ¶ 3, 893 P.2d 837 (1995). We interpret the contractual provisions not by "'isolating one particular sentence or provision, but by construing and considering the

entire instrument from its four corners.'" *Waste Connection of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013). And "'[t]he law favors reasonable interpretations,'" so results that defeat the contract's purpose and reduce it "'to an absurdity should be avoided.'" 296 Kan. at 963.

*Did the District Court Apply the Correct Measure of Damages?*

The parties do not dispute that they had a valid contract or that Anguiano breached it. The Smiths contend only that the district court erred by not awarding them a greater amount of damages.

The Smiths agree that the purpose of awarding damages is to make a party whole by restoring the party to the position the party was in before the injury. In a breach of contract claim, this requires the district court to put the nonbreaching party in the position the party would have been in had the other party not breached. *Louisburg Building & Development Co. v. Albright*, 45 Kan. App. 2d 618, 638, 252 P.3d 597 (2011).

The general rule of damages for personal property is that when the property "cannot economically be restored to its former condition, the measure of damages is the difference between its fair and reasonable market value immediately before and immediately after the damage." *Ultimate Chemical Co. v. Surface Transportation International, Inc.*, 232 Kan. 727, 729, 658 P.2d 1008 (1983). The district court found that the Smiths failed to provide evidence of the fair market value of the missing or damaged personal property immediately after the removal or damage of that property in 2015, so it had no factual basis for awarding damages for that missing or damaged property.

The burden of proving damages rests on the plaintiff. *Belot v. U.S.D. No. 497*, 27 Kan. App. 2d 367, 370, 4 P.3d 626 (2000). A determination whether the district court

5

applied the correct measure of damages is a question of law, over which an appellate court has unlimited review. *Peterson*, 302 Kan. at 106. The Smiths contend that the district court should have applied the replacement cost measure of damages.

The Smiths focus on Section Six of the lease, which states:

> "The Lessee agrees to maintain the premises and the [personalty] in condition and in the same numbers as such [personalty] may now be in, reasonable wear and tear excepted. Lessee shall replace [any] of such items as may be destroyed, damaged, or allowed to suffer unreasonable deterioration."

The Smiths contend this language unambiguously requires Anguiano to replace damaged, destroyed, or unreasonably deteriorated personal property and to pay the replacement cost if she failed to do so.

Anguiano argues that Section Six is not a damages provision and should not be interpreted as one. She maintains that the intent behind Section Six was to require her to replace the property when it needed replacement, but the provision did not establish a measure of future damages for any breach of the lease agreement. Thus, Anguiano argues, the lease did not require the court to award damages based on replacement value.

The parties agree that Section Six is not ambiguous, as do we. We thus look to the plain language of that provision to determine what the parties intended the provision to mean at the time of contracting. See *Peterson*, 302 Kan. at 104.

Section Six does not mention damages or how they would be measured if Anguiano breached the lease. It imposes an obligation on Anguiano to take care of and/or replace the personal property incorporated into the lease. This obligation is a term of the lease, much like the provision requiring weekly payment of rent. Thus, her failure to take

6

care of or replace personal property covered by the lease constitutes a breach, as the district court found. But nothing in this section or elsewhere in the lease states that if the lessee breaches the lease in this way, Anguiano must pay the replacement value of the property.

In fact, other provisions of the lease set out the consequences for a breach. Section 14 states that in the event Anguiano fails to pay when due, the Smiths have the right to immediate possession of the premises and to a lien for any unpaid rent. And Section 15 contains a catch-all damages provision, stating: "If you break this lease in any way you will lose all deposit funds and [be] subject possibl[y] to any lawyer fees to collect on this lease." Given the existence, content, and location of these damage provisions, Section Six was likely not meant to be a damages provision.

We also favor reasonable interpretations. The record shows that in 2009 when the lease began, three other tenants had used the property, some of which was already 25 years old. So when Anguiano's lease ended, some of the personal property had been used for over 30 years. Smiths' argument that the parties intended for Anguiano to pay the amount to replace the old property with new property fails to account for the age, condition, and resulting diminished value of the property and is thus unreasonable. In proving damages, the Smiths relied on pages from a catalogue showing what the cost could be to replace the old items with new items—they made no attempt to show the fair market value of the missing or damaged personal property immediately after it was damaged or removed in 2015. The district court properly found that they failed to meet their burden of proof as to these damages.

*Liquidated Damages*

The Smiths also argue that the district court improperly interpreted Section Six as a "liquidated damages" clause, when it should have interpreted Section Six as requiring

7

damages based on current replacement value. Anguiano counters that the district court did not treat Section Six as a liquidated damages provision—rather, the court found that the provision was not a damages provision at all.

We agree that the district court did not interpret Section Six as a liquidated damages provision. It did briefly discuss laws on stipulated damages provisions in contracts, likely because the Smiths, by requesting all new inventory, essentially interpreted Section Six as a "liquidated damages" provision. But the district court held that the Smiths failed to establish that the lease contained a liquidated damages provision.

Section Six cannot be reasonably interpreted to require liquidated damages in the event of a breach. It is well settled that parties to a contract may stipulate to the amount of damages for breach of the contract as long as the stipulation is found to be a liquidated damages clause rather than a penalty. *U.S.D. No. 315 v. DeWerff*, 6 Kan. App. 2d 77, 78, 626 P.2d 1206 (1981). The stipulated damages provision will be valid if the agreed upon amount is reasonable and the amount of damages would be difficult to determine. 6 Kan. App. 2d at 78. A liquidated damages provision is an agreed upon amount owed in lieu of performance. 6 Kan. App. 2d at 79.

But Section Six does not mention liquidated damages or actual damages. Section Six merely states that as a term of the contract, the lessee must agree to keep the lessor's personal property in the same condition as it was once turned over to the lessee, minus reasonable wear and tear. It mentions no amount of damages and does not state that one's breach of that duty will cause the lessee to pay replacement value. This is not an agreed provision stating the specific amount of damages that will be owed in the event of a breach. Section Six is merely a promise from Anguiano to replace or repair any of the Smiths' personal property if the property needs such replacement or repair. It creates the duty that Anguiano breached.

8

Because Section Six imposes an obligation on Anguiano and because potential lease breach remedies are discussed elsewhere in the lease, the parties could not have reasonably intended for Section Six to measure damages upon breach. Thus, replacement-value-based damages are not required under this lease.

We find no error in the district court's interpreting Section Six as establishing a duty rather than a measure of damages. We thus affirm its decision not to award damages based on replacement value.

*Did the District Court Err by Not Assessing Damages for an Air Conditioner Anguiano Removed from the Property?*

The Smiths next challenge the district court's decision not to assess damages for an air conditioner that Anguiano admittedly removed from the property.

The Smiths argue that the provision calls for Anguiano to repair and replace personal property, including fixtures, as needed. They argue that a reasonably prudent person would not interpret that to mean anything other than that Anguiano was required to keep working air conditioning and that the units were fixtures belonging to the owner of the building. Alternatively, the Smiths argue that even if the district court decided the air conditioner was Anguiano's, Section Seven requires Anguiano to get the Smiths' approval before removing the personal property. The Smiths argue Anguiano did not request approval and therefore could not have removed the unit without breaching the lease.

Anguiano maintains that neither the lease nor the 2009 inventory list of personal property ever mentioned the air conditioning unit. She also argues that the air conditioner was her own personal property that never became a fixture of the real property.

9

*Was the Air Conditioner a Fixture?*

The general rule in Kansas is that once personal property is affixed to the real estate, the property becomes part of the realty. A court considers three factors to determine whether personal property has become a fixture: "(1) annexation to the realty; (2) adaptation to the use of that part of the realty with which it is attached; and (3) the intention of the party making the annexation." *Stalcup v. Detrich*, 27 Kan. App. 2d 880, 886, 10 P.3d 3 (2000).

Whether a particular piece of property is a fixture of the real property presents a mixed question of law and fact. *In re Equalization Appeal of Prairie Tree, LLC*, No. 117,891, 2019 WL 493062, at *5 (Kan. App. 2019) (unpublished opinion). When reviewing a mixed question of law and fact, an appellate court applies a bifurcated review standard. The appellate court generally reviews the district court's factual findings under the substantial competent evidence standard and the resulting legal conclusions under a de novo standard. See *Gannon v. State*, 305 Kan. 850, 881, 390 P.3d 461 (2017). "Substantial competent evidence is such legal and relevant evidence as a reasonable person might regard as sufficient to support a conclusion." *Three Kings Holdings, LLC v. Six*, 45 Kan. App. 2d 1043, 1056, 255 P.3d 1218 (2011).

The district court did not make specific findings about these factors. It simply concluded as a matter of fact that the air conditioning unit was Anguiano's property, so she did not have to pay the Smiths for a replacement. But our task is to review these factors under a careful analysis of "'all the individual facts and circumstances attending the particular case.'" *Prairie Tree*, 2019 WL 493062, at *6. So we address these three factors individually.

### 1. *Annexation to Realty*

We first consider whether Anguiano permanently annexed the air conditioner to the real property. Anguiano bought the air conditioner as a piece of personal property and then attached it to the building, just like the other air conditioners. The air conditioner was necessarily attached to the building for use, but Anguiano was able to readily detach the unit, as shown by the fact that she removed it shortly after the lease ended. Although Anguiano presumably had to detach the hardware holding the air conditioning unit to the building, no facts show that Anguiano permanently annexed the unit to the realty or somehow damaged the realty by removing it.

Similarly, in *Stalcup*, the court determined that a 40- by 80-foot metal shed, although bolted to the concrete, was removable by detaching the bolts and removing metal sheeting. And because it could be removed without damage to the real estate, even though it was a large building, it was not permanently annexed to the real property. *Stalcup*, 27 Kan. App. 2d at 886-87.

In contrast, the *Prairie Tree* court held that a greenhouse was not personal property but was part of the real estate because it took over a year to build, cost $3.9 million to build, and was attached to concrete footings that extended several feet into the ground. *Prairie Tree*, 2019 WL 493062, at *6-8. These factors also contributed to the court finding the property to be part of the real estate for tax purposes because removal of the greenhouse would be "'exceedingly laborious and complicated.'" 2019 WL 493062, at *7.

Although we find no direct testimony regarding how and to what extent the air conditioner was attached to the building, removal of such a unit is generally not an "exceedingly laborious and complicated" act like removing a greenhouse. Nor did the Smiths testify that damage occurred when Anguiano removed the unit from the building.

11

Substantial competent evidence shows that the air conditioner was not annexed to the real property.

### 2. *Adaptation to the Realty*

We next consider whether Anguiano adapted the personal property to the real property. See *Gannon*, 305 Kan. at 881. To do this, the court must consider the individual's intended purpose for attaching the personal property to the real property. If the personal property was attached to the real property to make it more valuable, that is evidence that the personal property has become a fixture. *Prairie Tree*, 2019 WL 493062, at *8.

The record contains conflicting testimony about whether Anguiano bought the air conditioner to add a third unit to the existing two units or to replace a third unit that had stopped working. But after asserting that there were three units to begin with, Ben later agreed that when one unit stopped working, he told Anguiano he would not replace it. Anguiano replaced the third unit.

Anguiano's purpose in purchasing a new air conditioner was not to increase the value of the Smiths' property. She testified that the building had only two working air conditioning units at the beginning of her lease and that she bought a third because the two units Ben provided were not keeping the building cool enough for her business. The building was not dependent on the third unit, but the third unit created a more comfortable environment for her customers. Her testimony was supported by a previous employee who testified that the bar was too hot without a third working unit. Given the evidence, we find substantial competent evidence that Anguiano did not install the unit for the purpose of increasing the value of the Smiths' real property.

12

### 3. *Annexing Party's Intentions*

Lastly, we consider what the annexing party's intentions were when she affixed the personal property to the real estate. See *Stalcup*, 27 Kan. App. 2d at 886. Anguiano testified that she did not purchase and place the air conditioner on the property with the intent of making it part of the Smiths' real estate. Rather, when the Smiths refused to replace the third unit after it quit working, she purchased a third unit to make the building more comfortable for her customers. Given the evidence, the district court reasonably determined that Anguiano did not install the air conditioner on the property with the intent to leave it there permanently. This court must refrain from reweighing the witness testimony and evidence. See *Gannon*, 305 Kan. at 881.

Substantial competent evidence shows that the air conditioner was a fixture that did not become part of the real property. Although the district court did not explicitly make these findings, it reached the right result.

### *Section Seven*

The Smiths next argue, alternatively, that even if the district court decided that Anguiano owned the air conditioner, Section Seven of the lease required Anguiano to obtain approval before removing the unit upon termination of the lease, yet she failed to do so.

But that argument contradicts the plain language of Section Seven, which says:

> "Such additional personal[]ty as Lessee may [] place upon said premises . . . may be removed by them upon the termination of the lease provided, however prior arrangements must be made to the satisfaction of lessor for the repairs of any and all

damage that might [] occur[] to the walls, floors, ceiling, or other parts of said premises by removal of the fixtures and equipment of the personal[]ty belonging to the lessee."

This language does not require Anguiano to get the Smiths' permission before removing the air conditioner that she placed on the premises. Rather, under this clause, she had the right to remove the air conditioner when her lease terminated. And because the Smiths did not provide any evidence that Anguiano damaged their premises by removing the air conditioner, her duty to repair and its corresponding duty to make prior arrangements with the Smiths was not triggered.

We find no error in the district court's decision not to award damages for Anguiano's removal of the air conditioner.

*Did the District Court Err in Calculating the Amount of Damages?*

Lastly, the Smiths contend that the district court erred in calculating the amount of damages for the missing and damaged property. But this argument is based on the alleged errors above, which we have rejected.

We note that the district court awarded the Smiths damages consisting of Anguiano's security deposit and an insurance check for an unrelated claim. But neither the Smiths nor Anguiano—who did not cross-appeal—contend that these awards were in error. In fact, Anguiano argues the district court correctly calculated damages because, to avoid awarding the Smiths a windfall, the court awarded the Smiths her security deposit and an insurance check, totaling $4,500. And the catch-all damages provision in the lease states that if Anguiano breaks the lease "in any way, [she] will lose all deposit funds." So, we will not revisit these awards.

Affirmed.

14